**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

PAULINE FAGBUYI,                           *

     Plaintiff,                               *

v.                                          *                    Case No.: GJH-17-2876

PRINCE GEORGE'S COUNTY, *et al.*,           *

     Defendants.                             *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

Plaintiff Pauline Fagbuyi ("Plaintiff") brought this action against Prince George's County, Maryland and its Department of Health ("Defendants"), which formerly employed her as a nurse, alleging that she was wrongfully terminated and discriminated against in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act of 1967 ("ADEA"), and Maryland common law. ECF No. 9. On May 18, 2018, the Court granted Defendants' motion to dismiss Plaintiff's Title VII and Maryland wrongful termination claims but allowed her age discrimination claim to proceed. ECF Nos. 15, 16. Defendants now move for summary judgment on the remaining claim. ECF No. 34. No hearing is necessary. *See* Loc. R. 105.6 (D. Md.). For the following reasons, the Court will deny the Motion for Summary Judgment.[1]

---

[1] The Court notes Defendants' assertion in their Reply brief in support of summary judgment that the Prince George's County Department of Health is not a legal entity capable of being sued and therefore that claims against it should be dismissed. ECF No. 42 at 1 n.1. Defendants have offered no citations or arguments to substantiate this claim, however, and Plaintiff has had no opportunity to respond to it. The Court will thus refer to the two named parties as Defendants in addressing the present motion, although the question is irrelevant to the issues presented. *Cf. Kashaka v. Baltimore County*, No. Civ. L–04–2615, 2005 WL 1204591, at *1 (D. Md. May 20, 2005).

# I.     BACKGROUND[2]

Plaintiff, who is of Nigerian background and was born in 1947, was hired to work as a Community Health Nurse I at the Prince George's County Department of Health on February 21, 2006. ECF No. 34-4 at 2–3; ECF No. 34-18 at 5.[3] Plaintiff had been a registered nurse in Nigeria before coming to the United States, where she worked as a nurse in the District of Columbia and in Maryland for more than twenty years, specializing in pediatrics and immunization. ECF No. 34-18 at 9–11. In the first five to six months of her employment with Defendants, Plaintiff served in the Department of Health's Methadone Clinic. *Id.* at 15–17. She then transferred to a unit known as the Wellness Clinic, which operated within the county school system. *Id.* at 22–23. Effective February 21, 2007, she was promoted to Community Health Nurse II. ECF No. 34-4 at 1. Plaintiff continued at the Wellness Clinic through approximately 2011. ECF No. 34-18 at 27. During summers, when school was not in session, she assisted the staff of what is commonly known as the immunization department, a unit within the Health Department's Family Health Services Division formally named Clinical Services. *Id.* at 24; ECF No. 34-13 at 25, 127–28.

At the request of the head of Clinical Services, known as the "Program Chief," Plaintiff was then transferred to that unit full-time. *Id.* at 24–27.[4] Consistent with the purpose of the unit, Plaintiff's duties focused on providing care for patients aged 21 or younger, determining what vaccines they needed, and administering the necessary immunizations. *Id.* at 34–35. Plaintiff had three direct supervisors in her time at Clinical Services, the final of which was Ingra Lewis, who

---

[2] These facts are either undisputed or viewed in the light most favorable to Plaintiff as the non-moving party.

[3] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to page numbers generated by that system.

[4] Plaintiff indicated at one point in her deposition that she began in the immunization department in 2013, which she then contradicted by saying that that she began in 2011. ECF No. 34-18 at 27. It appears that the 2011 date is correct, given that Plaintiff testified that she had some informal supervisory duties in the immunization department for about two years, a period that apparently ended well before her termination in 2015. *Id.* at 25–26. Though the Court notes the ambiguity for the sake of completeness, Plaintiff's actual start date is immaterial here.

transferred into the unit and began supervising Plaintiff in October 2014. *Id.* at 28–29; ECF No. 34-10 at 20–21, 77. Lewis, whose title was Immunization Program Manager, supervised three to four nurses at that time, including Plaintiff. ECF No. 34-18 at 21. Lewis had previously interacted with Plaintiff in passing when Lewis was assigned to other units within the Health Department but did not otherwise know her. *Id.* at 26–27.

In her time supervising Plaintiff, Lewis had several concerns about her performance, including "mistakes that were being made in the records, maybe some forgetfulness, not getting to work on time, just things like that." *Id.* at 27. Lewis spoke with Plaintiff about these issues, formalized them in letters, and reported them to her own supervisor, Thelesa Bryant, who was the Program Chief for the Clinical Services unit. *Id.* at 27–29. At her deposition, Lewis testified that she told Bryant that she wanted "action taken," in that she wanted to determine how to "train" Plaintiff, help her "understand what needs to be done," and "get her to a point of being able to perform at the level that she needed to be" and "to help her improve her work performance." *Id.* at 28. When asked if she thought that Plaintiff was "physically unable to do the job," Lewis replied:

> I do, because a lot of times she would come in in the morning and she would complain about her legs -- her feet and her knees hurting. So she would have to take time out in the morning to go to the bathroom and to rub some stuff on her legs and everything prior to her getting ready for work. She did move slower in the clinic and, you know, so some days she had some challenges. She had a lot of pain. And she would verbally express, you know, she was in pain today.

*Id.* at 36–37.

In addition to expressing concerns about her ability to perform her work, Lewis repeatedly asked Plaintiff about her age and her plans for retirement. *Id.* at 37–40, 85–86, 96–97. According to Plaintiff, Lewis raised this topic on four occasions. ECF No. 34-18 at 64–65, 78,

98–100, 102–03, 104–06, 123–24. The first took place when Plaintiff went to Lewis's office with a form authorizing leave under the Family and Medical Leave Act so that Plaintiff could attend medical appointments to treat arthritis in her knees. *Id.* at 98. Plaintiff had given Lewis the form a week earlier, but when Lewis did not return it, Plaintiff went to Lewis's office to ask for it, and Lewis said "oh, Ms. Fagbuyi, your knee hurts you. You [sic] getting old." *Id.* at 98–99. A second incident occurred when Lewis at one point told Plaintiff to accompany her to Thelesa Bryant's office without telling her why. *Id.* at 99. While walking there, Lewis asked Plaintiff "Ms. Fagbuyi, how old are you?" *Id.* Plaintiff asked why Lewis was asking for her age, and Lewis "laughed and said I am just curious." *Id.* Plaintiff then asked Lewis not to ask about her age. *Id.* As they continued to walk, Lewis asked "Ms. Fagbuyi, you won't tell me your age? And you won't tell me when you are going to retire"? *Id.* at 100. Plaintiff said "please, do you have any problem with that? Is that why we are going to Ms. Bryant. And [Lewis] said no, no, no, I am just kidding." *Id.*

On arriving at Bryant's office, Plaintiff learned that Lewis had told Bryant that Plaintiff "ha[d] been extremely rude to [a] Hispanic mother" and had brought her to Bryant for punishment. *Id.* While Plaintiff was never disciplined or reprimanded for her purported rudeness, she did inform Bryant the same day that Lewis had made comments and inquiries about Plaintiff's age and retirement plans. *Id.* at 123–25. The following week, Plaintiff overheard two other nurses speaking to Lewis. *Id.* at 101. One of the nurses, identified by Plaintiff as "Freda," told Lewis not to talk about Plaintiff or ask for her age or when she was going to retire. *Id.* Plaintiff called Freda at the end of their shift to ask what had happened. *Id.* Freda said that "you have to be careful. Ingra is trying to get rid of you." *Id.* at 101–02. Freda further said that "Ingra

has been asking, you supposed to retire by now; everybody retire and you are not retiring," and that "Ingra said you too old to be here." *Id.* at 102.

A few days later, administrative staff members of the Health Department who had served for multiple decades received letters offering financial incentives for early retirement. *Id.* Plaintiff was unaware of the letters until Lewis called Plaintiff to ask if she had received a letter and if she was considering retiring. *Id.* at 102–04. Lewis also asked Plaintiff how old she was and said that "you should retire too." *Id.* at 103–04. When Plaintiff explained that she had only worked at the Department for nine years and was not interested in retiring, Lewis said "I just wanted to know, because you - - I think you are due for retirement; you supposed to have retired." *Id.* Plaintiff again told Lewis that she "was not ready to retire." *Id.* at 104–05.

In her deposition, Lewis confirmed that she had asked Plaintiff questions about Plaintiff's age and retirement plans. ECF No. 34-10 at 37–40, 85–86, 96–97. According to Lewis, a comment about retirement was part of a "general conversation" about which employees would be retiring or otherwise leaving the Department, which Lewis testified was a common conversation topic because there was a "mass exodus" of staff taking place at the time. *Id.* at 37–38, 85. Lewis emphasized that the comment about retirement "wasn't in a demeaning manner" or meant to be "derogatory." *Id.* at 39–40. Lewis also confirmed that she asked Plaintiff how old she was in the context of a conversation about Lewis's mother, who had died earlier that year. *Id.* at 85–86. Lewis's testimony is vague as to whether her questions about retirement and Plaintiff's age were part of the same conversation, though it is clear that Lewis's account does not describe the four different instances of comments that Plaintiff recounted.

At some point, Plaintiff reported Lewis's comments to Sonia Johnson, a human resources manager who "provided oversight over the Office of Human Resources in the Health Department

and Office of Human Resource Management for the County." ECF No. 34-18 at 105–06, 114; ECF No. 34-16 at 20–21. Plaintiff told Johnson that Lewis had asked about Plaintiff's age and her retirement plans and said that Lewis was "after me." ECF No. 34-18 at 105–06. Johnson, however, testified that she never received any reports while Plaintiff was employed at the Health Department about Lewis making age-related comments to Plaintiff. ECF No. 34-16 at 60–62. In a subsequent affidavit, Johnson clarified that while she did not recall Plaintiff complaining to her about Lewis, she spoke with Lewis after learning about her comments in an Equal Employment Opportunity Commission ("EEOC") charge of discrimination that Plaintiff filed after she was terminated. *Id.* at 60–61; ECF No. 34-17 at 3. Lewis confirmed that Johnson spoke with her about the comments at an unspecified time. ECF No. 34-10 at 38–42, 96–97. According to Lewis, Johnson told her that as a manager, Lewis had to be cautious in what she says in the workplace and that she should not "ask questions like that" or "say things like that" because they were inappropriate and unlawful. *Id.* at 39–40, 96–97. Lewis was not reprimanded or disciplined further and no written record of her conversation with Johnson was made. *Id.* at 40–42.

Lewis also testified at length about her poor relationship with Bryant, her supervisor, whom she said "gave me a very, very hard time," "harassed me," "micromanaged," "badgered me about things," "created a lot of grief in my life," and was generally "very, very hard to work with." ECF No. 34-10 at 23–25. In May 2015, Lewis testified, rumors began circulating within the Health Department that Bryant's Maryland nursing license had been suspended. *Id.* at 98. To confirm the rumors, Lewis checked the Maryland State Board of Nursing's public online database and confirmed that Bryant's license had lapsed in February 2015, meaning that she had been practicing without a license for three months by that time. *Id.* at 51–53, 88–89, 98. Lewis reported her discovery to Diane Young, Bryant's supervisor. *Id.* at 24, 53, 89. In a letter dated

June 22, 2015, the head of the Health Department, Health Officer Pamela B. Creekmur, informed Bryant that Creekmur intended to dismiss her from her position effective July 6, 2015 for failing to maintain her license. ECF No. 34-26. The termination date was later moved to July 17, 2015, ECF No. 34-27, and the action was finalized in a letter dated July 16, 2015, ECF No. 34-28.

The July 16 letter stated that Bryant could appeal Creekmur's decision to the Prince George's County Personnel Board. ECF No. 34-28. Following a hearing, the Board reversed Bryant's termination and ordered reinstatement and back pay in an opinion issued on August 19, 2016, ECF No. 40-3 at 2, 17, though Bryant ultimately chose not to return to the Department, ECF No. 34-16 at 99. In its decision, the Board found that Bryant had renewed her license on March 28, 2014, believing in good faith that she was paying for a two-year renewal and that her license would expire in 2016. ECF No. 40-3 at 4–5. The opinion also explained the Maryland Board of Nursing's license renewal procedures, which according to the Personnel Board vary depending on whether the licensee was born in a odd or even numbered year. *Id.* at 7. For nurses born in odd years, licenses expire at the end of the nurse's month of birth in the next odd year, while licenses for nurses born in even years expire at the end of the birth month in the next even year. *Id.* Bryant was born in February of an odd year, and therefore because she had renewed her license in March of 2014, it expired at the end of February 2015, unbeknownst to her. *Id.*

The Board also noted Johnson's role in Bryant's termination. Johnson learned about the license lapse on May 26, 2015 and directed Young to place Bryant on administrative leave the following day. *Id.* at 5–7. On June 11, Creekmur returned from a trip and met with Johnson, and they together decided to terminate Bryant without conducting further investigation. *Id.* at 9–10. According to the Board's recounting of the testimony before it, Johnson and Creekmur's decision was made for four reasons: (1) Bryant had been working without a license for three

months; (2) Bryant knew of issues with her license but had not told the Department; (3) Bryant could not provide documentation that the lapse was not her own fault; and (4) Creekmur did not feel that Bryant was "capable of maintaining a minimum standard of performance in her role because [Bryant] was a Program Chief and 'you have to be able to trust your leaders,' and 'three months, that's a long time.[']" *Id.* at 9. The Board rejected these reasons as inadequate to justify Bryant's termination, finding that the lapse was not Bryant's fault and noting that she took steps to renew her license the same day that she learned that it had expired. *Id.* at 14–15.

As with Bryant, the process that led to Plaintiff's termination also began with a license database check by Lewis. First, at approximately 8:30 AM on July 21, 2015 – four days after Bryant was terminated – Plaintiff was hand-delivered a letter from Creekmur informing her that she was being transferred from Clinical Services to the Department's HIV/STD Program effective August 3, 2015. ECF No. 34-18 at 118–19, 121–22, 139; ECF No. 34-16 at 128. According to Lewis, either she or Bryant had recommended that Plaintiff be transferred out of the immunization unit to the HIV program. ECF No. 34-10 at 29–31. Lewis testified that even if it was Bryant, Lewis would have recommended a transfer at that time because "at that point I thought, well, maybe immunizations is too challenging for Ms. Fagbuyi because it's [sic] some of the things that we were required to do. Maybe – maybe this is not the area for her anymore." *Id.* at 31. She also testified that "maybe immunizations didn't work necessarily for Ms. Fagbuyi at this time. Because the work that we do can be very challenging. It's a lot that's required. It's a lot that we must remember, and it may not be for everybody." *Id.* at 29.

Asked if she meant that the position required someone younger, Lewis testified that "[a]ge doesn't have anything to do with it, just who's able to really get the job done. So maybe this is not for Ms. Fagbuyi anymore – that was my thought – because of all the areas and the

mistakes that was being made. Maybe her time served here is up. Maybe she doesn't want to do this anymore. Because with immunizations you have to be really focused on what you're doing." *Id.* at 31–32. Lewis could not recall, but agreed it was possible, that Plaintiff had told her that she liked immunizations and wanted to stay in that unit. *Id.* at 32–33. When asked if she knew that Plaintiff felt that the two of them did not have "the best working relationship," Lewis replied that she "didn't have anything against Ms. Fagbuyi. Was she the best employee? No. She had a lot of challenges. She couldn't really do the job well anymore because of all the mistakes that she made. But her personally as an individual, no, I didn't have anything against her." *Id.* at 34, 36. Asked again about the reasons for the transfer, Lewis testified that the HIV program needed nurses, and "it came up, hey, maybe this program isn't the right program for Ms. Fagbuyi at this time. She can be transferred to HIV, to the HIV program, which needed more help." *Id.* at 87.

Plaintiff testified that she went to speak with Lewis shortly after she received the transfer letter, at approximately 8:45 AM that morning, and that Lewis acted surprised and dismayed at the news. ECF No. 34-18 at 65–66, 121–22. According to Plaintiff, Lewis was "faking crying" and saying "Ms. Fagbuyi, I don't want you to leave." ECF No. 34-18 at 107, 122. At 10:30 AM that morning, Lewis came to Plaintiff's office and told her that her nursing license had expired. *Id.* at 36. According to Lewis, she had just performed a "quality assurance review" of Plaintiff's license and discovered that it had lapsed at the end of the previous month, June 2015. ECF No. 34-10 at 42–43, 47. When asked why she checked Plaintiff's license status that day, Lewis testified that she did "random checks" of the licenses of the four nurses she supervised and that on July 21, 2015, she "was doing a random check" and "just going and reviewing, and that's it." *Id.* at 50. Asked if she reviewed any other licenses that day, she testified that she "probably did," and that "sometimes when I'm doing it I'll just go back and review everybody's." *Id.* at 51.

When Lewis told Plaintiff that her license was expired, Plaintiff responded that she believed her license was current, that information showing otherwise was mistaken, and that she had documentation of her license status at home. *Id.* at 57–58; ECF No. 34-18 at 36–37. Plaintiff asked for leave to retrieve the documentation, which Lewis approved at the direction of Lewis's new supervisor, Frances Caffie-Wright. ECF No. 34-10 at 58–59; ECF No. 34-18 at 36. Plaintiff accordingly went home and searched but could not find the documents she was looking for. ECF No. 34-18 at 37. She then called the state Nursing Board to explain the situation and confirmed that her license had indeed expired. *Id.* at 47. At the encouragement of the Nursing Board staff member she spoke with, Plaintiff drove to the Nursing Board's offices in Baltimore and paid for a two-year renewal. *Id.* at 50, 130. Although Plaintiff recalled that she had renewed her license in 2014 and that the receipt she was given showed an expiration date in 2016, she learned at the Nursing Board that the 2016 date was the expiration date of the credit card she used to pay for the renewal, not the expiration date of the license. *Id.* at 37, 40, 47, 130. The Board staff member also told her that she had a 30-day grace period for renewal. *Id.* at 59. Once her license was renewed, Plaintiff took the payment receipt she was given and returned to her office to provide it to Lewis, but Lewis had left for the day. *Id.* at 47–48, 59, 130–31.

Plaintiff brought the receipt to Lewis the next morning. *Id.* at 48; ECF No. 34-10 at 59–60, 114. Lewis warned her that even with the renewal, "I don't know what they are going to say. I don't know if they are going to allow you to work." ECF No. 34-18 at 59, 61. The following day, Johnson called Plaintiff and told her that she was being placed on administrative leave in connection with the license lapse and needed to go home until further notice, which Plaintiff did. *Id.* at 61. The following Monday, Johnson called and told Plaintiff she could come back to work, but that she did not know what punishment Health Officer Creekmur would give Plaintiff. *Id.* at

62–63. When Plaintiff returned, she spoke with Deborah Beasley, another Health Department nurse who was the president of the union to which Plaintiff belonged, and told Beasley that Lewis had tried to transfer her and had faked ignorance and sadness when Plaintiff asked about it. *Id.* at 64–66. Plaintiff felt compelled to inform the union what had happened because of that conversation with Lewis, as well as Lewis's prior comments about Plaintiff's age and retirement plans and the incident when Lewis brought Plaintiff to Bryant for punishment, which together led Plaintiff to feel that "something was coming." *Id.* at 64–66.

After Plaintiff had returned to work for approximately one week, Johnson asked Plaintiff to meet her in Beasley's office. *Id.* at 63–64. When Plaintiff arrived, Johnson presented her with a letter from Creekmur dated August 4, 2015 informing Plaintiff that Creekmur intended to dismiss her because she had worked for three weeks with a lapsed license in violation of § 16-194(a) of the Prince George's County code. *Id.* at 63, 71–72; 141.[5] The letter provided Plaintiff with ten days to respond. *Id.* at 72, 141. Plaintiff asked Johnson why she was being dismissed given that she had a 30-day grace period after her license lapsed and because, to Plaintiff's knowledge, Beasley had only received a three-day unpaid suspension when she had had a license lapse issue. *Id.* at 73. Johnson responded that she did not "know what to say" because the letter "is not from me" and that Plaintiff should "[t]ry and tell her within the 10 days, maybe she will convince [sic] why this happened." *Id.* Beasley then advised Plaintiff to contact another union official, Debra Jones, about filing a union grievance. *Id.* at 74–75. Plaintiff met the next day with Jones, and later with Jones and her supervisor, Carlton Gullab. *Id.* at 76–78.

On August 7, 2015, Plaintiff sent a response letter to Creekmur recounting Lewis's notification that her license had expired, her attempt to find her renewal materials, her trip to the

[5] Johnson testified that she had drafted the letter and that it was reviewed by the Prince George's County Office of Human Resource Management before it was given to Plaintiff. ECF No. 34-16 at 58–60.

Nursing Board in Baltimore, her administrative leave, and her receipt of the notice of intended dismissal from Johnson. *Id.* at 152. Plaintiff explained that she renewed her license within what she understood as a 30-day grace period and "respectfully plead[ed] that [Creekmur] consider a lesser disciplinary action." *Id.* On September 2, 2015, however, Creekmur sent Plaintiff a final decision letter terminating Plaintiff's employment effective September 3, 2015 for her violation of § 16-194 of the Prince George's County code. *Id.* at 88, 154. In her deposition, Johnson elaborated on the application to Plaintiff of that provision, titled "Performance-related disciplinary actions." § 16-194(a) authorizes disciplinary action against an employee, including termination, when the "employee's performance has become 'less than satisfactory' with respect to the execution of any or all of the duties, tasks, and/or responsibilities set forth in the employee's position description." ECF No. 34-15 at 14.

The provision then offers three criteria to indicate "less than satisfactory" performance, including § 16-194(a)(3), which states that "[w]here the employee loses or fails to maintain any of the requirements or standards set forth in the qualification requirements statement . . . applicable to the employee's position." *Id.* at 15. Johnson testified that Plaintiff's lapse of license fell within that provision and was the basis for her termination. ECF No. 34-16 at 91, 93–94. When asked if she was aware that Plaintiff's last performance evaluation before her termination indicated that she was not performing in a less than satisfactory capacity, Johnson answered that Plaintiff was "in a satisfactory status." *Id.* at 93. Asked whether the Department had its own policy requiring continuous licensing, Johnson testified that there was a licensing policy in place, but conceded that it made management staff responsible for notifying employees that their licenses were set to expire and that Plaintiff had received no such notification. ECF No. 34-16 at

31–34; *see also id.* at 124. Johnson also conceded that she had no evidence that Plaintiff ever received a copy of that policy. *Id.* at 105–06.

Johnson also testified that Plaintiff was terminated, rather than given a lesser punishment, consistent "with the action taken with Ms. Bryant for her license lapsing." *Id.* at 64, 76. In explaining that Plaintiff's mistake about the expiration date of her license was not considered in the decision to terminate her, Johnson noted that Bryant also cited confusion about her license's expiration date to justify her failure to renew. *Id.* at 77. Therefore, Johnson explained, "we were being consistent" because Bryant "had just been terminated for the same reason. And her reason or her error, again, was pretty much the same as Ms. Fagbuyi's, that they made an error in either what they thought they had done or what they thought the document was. So it was just consistency in the action that was imposed to both staff members." *Id.* at 78–79. Johnson reiterated this consistency rationale when asked if she had considered that Bryant worked with an expired license for three months while Plaintiff did so for only three weeks. *Id.* at 79–80.

In her affidavit, Johnson declared that she and Creekmur made the "ultimate decision" to terminate Plaintiff and that the "decision was not made by Ms. Lewis, nor does Ms. Lewis have the power to make such a decision." ECF No. 34-17 at 3. Instead, Johnson stated, "[t]he decision that was [sic] made by myself and the Health Officer and it was based solely on the fact that Ms. Fagbuyi failed to renew her license." *Id.* at 4. "The Health Officer had a zero-tolerance policy for this type of behavior and that is why termination was imposed," Johnson clarified, noting that Creekmur had also terminated Bryant that year for a license lapse. *Id.* Johnson further stated that "[n]one of the performance issues noted by Ms. Lewis were considered in terms of making the decision to terminate Ms. Fagbuyi" and noted that "Ms. Lewis never recommended termination or any other type of discipline for Ms. Fagbuyi to myself or to the Health Officer." *Id.* In her

deposition, Lewis testified that she was unaware that Plaintiff was being terminated, believed Plaintiff was simply being transferred, and was surprised when she learned what had happened. ECF No. 34-10 at 66–67. Lewis also testified that aside from her concerns about Plaintiff's timeliness, the mistakes she made, and the incident in which she was allegedly rude to a patient, there was nothing unsatisfactory about Plaintiff's performance in her role. *Id.* at 68.

On September 16, 2015, Plaintiff submitted a union grievance form that union official Debra Jones had prepared with her. ECF No. 34-18 at 76, 144. The grievance alleged that the Health Department had violated Prince George's County code and the union's collective bargaining agreement in terminating Plaintiff and sought reinstatement, back pay, and removal of adverse documentation from her personnel file. *Id.* at 144. The form was received by the Prince George's County Office of Human Resources Management and assigned by that Office's Deputy Director Rhonda Weaver to Risk Analyst Shalisha Ivy, who presided over a grievance hearing on December 10, 2015 at which Johnson represented the Department and Jones's supervisor Gullab represented Plaintiff. *Id.*; ECF No. 34-12 at 7, 36–38. Both representatives elicited testimony from other attendees, who included Plaintiff, Lewis, Frances Caffie-Wright, Jones, and another union official. ECF No. 34-18 at 79; ECF No. 34-12 at 37–38.

In her testimony, Lewis recounted the circumstances of her discovery that Plaintiff's license had expired on June 28, 2015 and "emphasized" that she had contacted the Nursing Board to confirm the expiration before informing Plaintiff. ECF No. 34-12 at 37–38. Caffie-Wright stated that every registered nurse is aware of the professional obligation to possess a valid license at all times. *Id.* at 38. After eliciting these statements, Johnson argued that functioning as a nurse with an expired license "had potentially serious negative implications, not

only for the Department, but the County as well," and that "a nurse practicing even one (1) day without a valid license poses a huge liability for the County." *Id.*

Gullab also examined Lewis and Caffie-Wright and elicited three main admissions. *Id.* at 38. First, Lewis agreed that the "conditions of employment" section of the description for Plaintiff's Community Health Nurse II position required possession of a valid nursing license only "at the time of appointment" and set no license requirements beyond that time. *Id.* at 38; *see* ECF No. 34-6 at 5. Second, Lewis and Caffie-Wright acknowledged that there was "no official County policy within the Department regarding licensing." ECF No. 34-12 at 38. Finally, Caffie-Wright confirmed that Plaintiff held a valid license when she was issued the notice of intent to dismiss on August 4, 2015. *Id.* Plaintiff also spoke at the hearing, explaining that she was aware of her obligation to renew her license, that she checked her status regularly, that she mistook her credit card expiration date for the date of her license expiration when she checked her status in June 2015, and that she immediately paid the required fee and renewed her license the same day that she learned of the lapse. *Id.* at 39. Plaintiff also stated that she felt embarrassed for letting her license expire but felt that termination was too harsh of a punishment for what she called "an honest mistake." *Id.*

Risk Analyst Ivy affirmed Plaintiff's dismissal in a letter to Johnson and Gullab on January 8, 2016. *Id.* at 36. Most important in Ivy's decision were Plaintiff's admissions that her license had expired on June 28, 2015 and that she was aware of her responsibility to continually renew her license in order to practice. *Id.* at 39. Those admissions led Ivy to disregard arguments about the lack of a County license policy or a requirement in Plaintiff's position description that she maintain her license. *Id.* at 39. The decision also rejected an argument by Gullab that the 30-day grace period Plaintiff had referred to in her response letter to Creekmur, which is established

by a Maryland regulation, provided Plaintiff thirty days after her license expiration during which she could not be terminated. *Id.*[6] Ivy concluded that the regulation offered no termination protection and merely allowed Plaintiff to renew her license within that period without restarting the licensing process as a new applicant. *Id.* at 40. Ivy's ultimate conclusion – that Plaintiff's dismissal "was justified" – was based on the state requirement that nurses hold valid licenses to practice. *Id.* Though Ivy did not provide a citation for that conclusion, the Maryland Health Occupations Code bars practicing as a registered nurse or licensed practical nurse without a state-issued license, as well as knowingly employing an unlicensed person to practice in such a role. Md. Code Ann., Health Occ., §§ 8-701, 8-706; *see* ECF No. 34-14. Ivy's letter explained the process for appealing her decision, though Plaintiff did not do so. ECF No. 34-12 at 40.

On May 19, 2016, Plaintiff signed a charge of discrimination with the EEOC alleging that she was terminated from her position on the basis of her race, color, national origin, and age in violation of Title VII, the ADEA, and Maryland state law. ECF No. 10-4.[7] The EEOC mailed Plaintiff a dismissal and notice of right to sue on June 28, 2017. ECF No. 10-5. Plaintiff then initiated this action on September 28, 2017, ECF No. 1, and filed an Amended Complaint on December 21, 2017, ECF No. 9, which alleged that Plaintiff's discharge violated Title VII and the ADEA and was a wrongful termination under Maryland law, *id.* at 5–8. Defendants filed a Motion to Dismiss the Amended Complaint on January 4, 2018. ECF No. 10. On May 18, 2018, the Court granted in part and denied in part the Motion to Dismiss in a memorandum opinion, dismissing the Title VII and wrongful termination claims but allowing the ADEA claim to

---

[6] The provision, Md. Code Regs. 10.27.01.15, provides that "A license expires on the 28th day of the licensee's birth month," and that "A licensee has a 30-day grace period beyond the expiration date of a license to renew a license." *See* ECF No. 34-12 at 13, 42.

[7] Plaintiff's Amended Complaint states that the charge was filed with the EEOC on or about June 1, 2016. ECF No. 9 ¶ 25; *see also* ECF No. 15 at 3.

proceed. ECF Nos. 15, 16. Defendants answered the Amended Complaint on June 1, 2018, ECF No. 17, and filed the pending Motion for Summary Judgment on April 12, 2019, ECF No. 34. Plaintiff filed an Opposition to the summary judgment motion on June 10, 2019, ECF No. 40, and Defendants submitted a Reply on July 16, 2019, ECF No. 42.[8]

In the Amended Complaint, Plaintiff alleged that similarly situated nurses were not similarly disciplined when their licenses expired. ECF No. 9 ¶ 18. In the course of depositions and in her briefing, Plaintiff raised the expirations of licenses held by Thelesa Bryant, who was born in 1969, Deborah Beasley, the union president, born in 1956, and a third nurse, Lisa Berry, born in 1968. ECF No. 34-24 at 2; ECF No. 34-20 at 2; ECF No. 34-29 at 2. The circumstances of Bryant's termination have already been described in detail. Beasley's lapse, as mentioned above, resulted in Creekmur imposing a three-day unpaid suspension. ECF No. 34-23 at 2. According to Creekmur's January 30, 2013 notice of proposed disciplinary action for Beasley, Beasley worked with an expired license from August 28, 2012 to January 10, 2013. ECF No. 34-21 at 2. Notably, however, the letter proposed only a ten-day suspension. *Id.* In a response letter, Beasley explained that she had paid for a license renewal on August 15, 2012, received an emailed receipt, and believed her license was valid until she received a postcard on January 9, 2013 stating that the process was unfinished because she had not completed a criminal background check, which she had never before been required to undergo for renewal. ECF No. 34-22 at 2. Creekmur's final notice of disciplinary action acknowledged Beasley's explanation

---

[8] Plaintiff's Opposition brief asserts in a preliminary statement that Plaintiff brings claims under both the ADEA and the Maryland Human Rights Act and that Defendants do not seek dismissal of the latter claim in this motion. ECF No. 40 at 3. The Court is uncertain what Plaintiff is referring to; while Plaintiff brought a Maryland Human Rights Act claim in her original Complaint, ECF No. 1, the claim was not included in her Amended Complaint, ECF No. 9, and accordingly no such claim is before the Court. The Court therefore considers only Plaintiff's ADEA claim, the only claim that survived Defendants' Motion to Dismiss. *See* ECF No. 16.

and shortened the suspension, noting also that the state Nursing Board was experiencing a processing backlog at that time. ECF No. 34-23 at 1.

Berry's license lapse, for which she also received a three-day suspension, took place in 2010 under then-Health Officer Dr. Donald Shell. ECF No. 34-16 at 97; ECF No. 34-17 at 1–2; ECF No. 34-18 at 56, 58; ECF No. 40-3 at 11, 16. Plaintiff testified at her deposition that she spoke with Berry to ask what had happened during that incident. ECF No. 34-18 at 57. Berry explained to Plaintiff that her supervisor informed her that her license had lapsed three months earlier, she was told to renew it and did so, and received a short suspension of approximately three days. *Id.* at 57–58. According to Johnson, who was not employed by Defendants at that time, Berry received no other discipline, but there was no other information in Berry's personnel file to shed further light on what took place. ECF No. 34-16 at 53–55. Johnson also testified that she did not know what policies may have been in effect at the time of Berry's lapse. *Id.* at 100. In her affidavit, Johnson stated that policies governing licensure requirements were in effect but not rigorously enforced when Dr. Shell served as Health Officer. ECF No. 34-17 at 3.

## II.     STANDARD OF REVIEW

Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006). A material fact is one "that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248–49. However, the nonmoving party "cannot create a genuine

issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). The Court may rely on only facts supported in the record, not simply assertions in the pleadings, in order to fulfill its "affirmative obligation . . . to prevent 'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 323–24). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## III.    DISCUSSION

"The ADEA makes it 'unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age.'" *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725 (4th Cir. 2019) (quoting 29 U.S.C. § 623(a)). "An employee who alleges that her employer violated this prohibition 'must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the "but-for" cause of the challenged employer decision.'" *Id.* (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009)). "Direct evidence must be 'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.'" *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (quoting *Taylor v. Va. Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc)). "Even if there is a statement that reflects a discriminatory attitude, it must have a nexus with the adverse employment action." *Id.* (citing *Brinkley v. Harbour Recreation Club*, 180 F.3d 589, 511 (4th Cir. 1999)).

A plaintiff can alternatively defeat summary judgment under the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). *See*

*Westmoreland*, 924 F.3d at 725. To establish a prima facie case of unlawful age discrimination-based discharge, a plaintiff must demonstrate that: "(1) [s]he was a member of the protected class—that is, older than 40; (2) [s]he was discharged; (3) [s]he was qualified for the job and met [the employer's] legitimate expectations; and (4) [her] position remained open or was filled by a similarly qualified individual who was substantially younger." *Hill v. Se. Freight Lines, Inc.*, 523 F. App'x 213, 215 (4th Cir. 2013) (citing *Warch*, 435 F.3d at 520). "[T]he burden [then] shifts to [the employer] to demonstrate 'a legitimate, nondiscriminatory reason' for the adverse employment action." *Darnell v. Tyson Foods, Inc.*, 536 F. App'x 366, 369 (4th Cir. 2013) (quoting *Warch*, 425 F.3d at 513–14). If the employer "meets this burden, 'the presumption of discrimination created by the prima facie case disappears from the case and the plaintiff must prove that the proffered justification is pretextual.'" *Id.* (quoting *Warch*, 425 F.3d at 514).

Plaintiff here opposes summary judgment under both theories. She first asserts that Lewis's questions and comments to Plaintiff about her age and her plans for retirement are direct evidence of age-based discrimination. Anticipating this argument, Defendants claim that the comments show insufficient evidence of animus to support a direct evidence claim because they were not "blatant, nor do they evince any intent to discriminate based on age." ECF No. 34-2 at 14. Defendant primarily relies on Fourth Circuit case law in which employers made unspecific, isolated comments about the benefits of employing younger workers. For example, in *Warch v. Ohio Casualty Insurance Co.*, the court found insufficient the statement that an older job applicant would struggle to be hired because "hiring people at that age, they didn't get the work out of them that they did younger people." 435 F.3d at 520. The court saw no evidence that that comment was "more than an isolated event." *Id.*

Similarly, in *Birkbeck v. Marvel Lighting Corp.*, the court found a one-time statement that "there comes a time when we have to make way for younger people" inadequate evidence of discrimination. 30 F.3d 507, 511–12 (4th Cir. 1994). In *EEOC v. Clay Printing Co.*, the court held that statements that the employer needed to "attract newer, younger people" and was lacking in "young blood" were "not probative of age discrimination or a discriminatory purpose." 955 F.2d 936, 942 (4th Cir. 1992). Finally, in *Mereish v. Walker*, the court concluded that comments about the societal process of generational change were not actionable and that when viewed in context, a statement that the employer needed to protect its "young, bright, junior scientists" showed that the employer was concerned with whether workers were trained using recently developed methods, not with their age. 359 F.3d 330, 336–37 (4th Cir. 2004).

Lewis's comments and inquiries to Plaintiff, however, are substantially more specific and directly indicative of age-based animus than the statements in the cases Defendant cites. According to Plaintiff – in whose favor the facts must be construed at this stage – Lewis asked Plaintiff about her age and retirement plans on multiple separate occasions: when Plaintiff went to Lewis to obtain her signature on an FMLA leave form, ECF No. 34-18 at 98–99; when Lewis took Plaintiff to Bryant's office for discipline after Plaintiff was allegedly rude to a patient, *id.* at 98–101; and when Lewis asked Plaintiff if she was considering accepting financial incentives for early retirement, *id.* at 102–05.[9] During these conversations, Plaintiff testified, Lewis told her that she was "getting old," *id.* at 99, asked how old Plaintiff was, *id.* at 99, 103, asked her about when she was going to retire, *id.* at 100, or told her she should retire or was supposed to have

---

[9] Defendant claims that the conversation Plaintiff overheard between Lewis and their colleague Freda in which Freda warned Lewis not to ask about Plaintiff's age, and Plaintiff's subsequent call to Freda in which Freda said that Lewis had commented about Plaintiff's age, are hearsay. ECF No. 40 at 15. Because it is not necessary to the Court's conclusion, the Court will not consider these statements at this juncture, without determining whether they would be considered hearsay.

retired, *id.* at 104–05. These questions and comments are detailed and personally targeted at Plaintiff, unlike the remarks in the cases on which Defendants rely, which were generalized, isolated, or mitigated by context.

Of course, as this Court has explained, "[s]ome comments or inquiries about retirement, without more, do not establish direct evidence of age-related discrimination." *Houston v. Kirkland*, No. GJH-15-2507, 2016 WL 7176580, at *10 (D. Md. Dec. 7, 2016) (citing *DeBarr v. Cleveland Clinic Found.*, 918 F. Supp. 2d 676, 683 (N.D. Ohio 2013); *Halloway v. Milwaukee Cty.*, 180 F.3d 820, 825 (7th Cir. 1999)). "But 'while it is true that an employer's "friendly" inquiries about retirement cannot usually support a finding of age discrimination . . . not all inquiries about retirement are "friendly" and . . . repeated and unwelcome inquiries may certainly be relevant to a showing of age discrimination.'" *Id.* (quoting *Leonard v. Twin Towers*, 6 F. App'x 223, 230 (6th Cir. 2001)). In *Houston v. Kirkland*, the plaintiff claimed that the defendants told her that her salary was being cut because she was "old enough to collect social security" and she was going to retire soon, and further asserted that she was repeatedly asked when she would retire and was told that she should. *Id.* This evidence was sufficient, in the Court's view, to deny summary judgment on the Plaintiff's direct-evidence ADEA claim. *Id.*; *see also Loveless v. John's Ford, Inc.*, 232 F. App'x 229, 233 (4th Cir. 2007).

The Court reaches the same conclusion here. Plaintiff has set forth evidence that Lewis's comments about her age and retirement plans were both repeated and unwelcome. *See* ECF No. 34-18 at 99, 104–05. That Lewis made the comments in the context of potential or actual personnel action – approval of a request for leave, a disciplinary meeting with Lewis's supervisor, and an announcement of early retirement incentives – could lead a reasonable factfinder to conclude that Lewis was specifically mindful of Plaintiff's age in connection with

her status as an employee. Further, Lewis readily admitted that she raised Plaintiff's age and retirement plans with her, had concerns about Plaintiff's physical ability to perform her work and mistakes she had made, and recommended or supported recommending Plaintiff for a transfer because of those concerns. ECF No. 34-10 at 37–40, 85–86, 96–97. Lewis repeatedly testified to her thoughts at the time of the recommended transfer that Plaintiff might not be suited for immunization "anymore." *Id.* at 31, 36, 87. While Lewis's account of the timing and content of her remarks differs from Plaintiff's, construing the record in Plaintiff's favor produces a genuine dispute of material fact.

Even if Lewis's comments reflect a discriminatory attitude, however, they must have had a nexus with Plaintiff's termination in order to give rise to liability. *See Warch*, 435 F.3d at 520; *EEOC v. CTI Glob. Sols.*, 815 F. Supp. 2d 897, 906–07 (D. Md. 2011). In other words, as Defendants argue, if Plaintiff has not raised a genuine dispute of fact that Lewis was sufficiently involved in the decision to terminate her, Plaintiff cannot proceed on a direct evidence theory. Plaintiff responds to this argument in two ways. First, Plaintiff denies an assertion in the Motion for Summary Judgment's statement of facts that "Lewis did not recommend termination of Plaintiff, nor did she pay [sic] any role in the decision-making process." ECF No. 40 at 14. Plaintiff provides citations to two documents to substantiate the denial: testimony by Johnson that she could not recall whether a draft notice of proposed discipline was provided by "the supervisor," ECF No. 34-16 at 58, and Defendants' listing of Lewis in responding to an interrogatory asking for the names of individuals who "participated in the decision to terminate [Plaintiff's employment]." *See* ECF No. 40-4 at 6.

This evidence fails to raise a genuine dispute about Lewis's role in Plaintiff's termination. Johnson's testimony at the cited pages was that in some cases supervisors provide

draft proposed discipline letters to her and that she could not remember if she received such a draft here. ECF No. 34-16 at 58. Johnson later clarified, however, that in this case, Lewis informed Johnson that Plaintiff's license had lapsed and provided a document outlining "what exactly took place," but did not "make a recommendation for termination." *Id.* at 107; *see also* ECF No. 37-14 at 4. Lewis also testified that she made no such recommendation, ECF No. 34-10 at 87, and Johnson's affidavit clarified that Lewis had no power to make termination decisions. ECF No. 37-14 at 3. This testimony about Lewis's actions and authority clarifies the unclear testimony that Plaintiff cited and bars Plaintiff's interpretation. As for the interrogatory response listing Lewis as a participant in the termination decision, it would be unreasonable for a factfinder to conclude that the response is an admission by Defendants about Lewis's role in light of the subsequent testimony and affidavits by Johnson and Lewis that state otherwise. ECF No. 40-4 at 6. Plaintiff therefore has not presented specific evidence in the record that Lewis was involved in the decision to terminate her.

Plaintiff also points, however, to implicit indications that Lewis was sufficiently involved in the decision to render her animus the but-for cause of the termination. These arguments center on Lewis's explanation for her decision to check Plaintiff's license on July 21, 2015 and on Johnson's denials that she was aware of Lewis's remarks to Plaintiff before Plaintiff filed her EEOC charge. First, as Plaintiff argues persuasively, a reasonable factfinder could disbelieve Lewis's explanation that she verified Plaintiff's license status as part of a "random check" in light of the sequence of events at that time. ECF No. 34-10 at 50. Lewis performed the check immediately after Plaintiff protested her transfer and less than a week after Bryant was terminated, a process that also began with Lewis checking her license status. Additionally, Lewis's statement in the grievance hearing that she verified the lapse with the state Nursing

Board before informing Plaintiff conspicuously was not part of the narrative she offered in her deposition. By combining these points with Lewis's comments about Plaintiff's age and the evidence that she believed Plaintiff should retire, a factfinder could reasonably draw the inference that Lewis checked Plaintiff's license and informed Johnson that it was expired in hopes of causing Plaintiff's termination.[10]

Next, while Plaintiff must demonstrate a nexus between Lewis's motivations and Johnson's actions, the question whether Johnson knew about Lewis's comments and concerns about Plaintiff at the time Johnson prepared the proposed notice of discipline is substantial and unresolved. Plaintiff testified that she spoke with Johnson in person to report Lewis's comments, ECF No. 34-18 at 105–06, and Lewis confirmed that Johnson came to speak with her about them, ECF No. 34-10 at 38–42, 96–97. Johnson's testimony, in contrast, is that she did not recall speaking with Plaintiff about Lewis's comments and did not learn about them until after Plaintiff was terminated. ECF No. 34-16 at 60–62; ECF No. 34-17 at 3. Though neither Plaintiff's nor Lewis's account confirms the timing of their conversations with Johnson, Plaintiff's testimony and Johnson's plainly cannot both be accurate, given that Plaintiff could not have spoken with Johnson after her termination. If Johnson in fact knew of the comments and accepted Lewis's age-based concerns about Plaintiff's performance before the termination process began, that

---

[10] Notably, though Plaintiff does not directly raise it here, the so-called "cat's paw" or "rubber stamp" theory of liability holds that an employer may be liable if a supervisor's act motivated by unlawful animus was the cause of an adverse employment action. *See Smyth-Riding v. Scis. & Eng'g Servs, LLC*, 699 F. App'x 146, 155 (4th Cir. 2017) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)); *see also Vincent v. Medstar S. Md. Hosp. Ctr.*, No. TDC-16-1438, 2017 WL 3668756, at *7 (D. Md. Aug. 22, 2017). As the Fourth Circuit has explained, "Title VII and the ADEA do not limit the discrimination inquiry to the actions or statements of formal decisionmakers for the employer. Such a construction of those discrimination statutes would thwart the very purposes of the acts by allowing employers to insulate themselves from liability simply by hiding behind the blind approvals, albeit non-biased, of formal decisionmakers." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 290–91 (4th Cir. 2004), *abrogated on other grounds by Gross*, 556 U.S. 167.

permits a reasonable inference that those concerns were what motivated her to recommend termination to Creekmur after Lewis informed her that Plaintiff's license had expired.

Of course, Plaintiff cannot dispute that practicing without a license was a violation of her duties under state law and would have been a legitimate ground for some kind of discipline by Defendants. If Defendants had firm policies imposing termination for license lapses, it would be irrelevant under the ADEA whether her supervisor or a human resources official harbored age-based animus toward her because the lapse would be the but-for cause of her termination. But in her alternative analysis under the *McDonnell Douglas* framework, Plaintiff raises a genuine dispute over whether Health Officer Creekmur's purported zero tolerance policy for license lapses was a pretextual justification for the decision to terminate her. Stepping back first to her prima facie case, Plaintiff satisfies the age and adverse action prongs because she was born in 1947 and discharged. Plaintiff also satisfies the fourth prong – that she was not replaced or was replaced by someone substantially younger – because Defendants conceded in their interrogatory responses that "Plaintiff was never replaced by anyone." ECF No. 40-4 at 7.[11]

Plaintiff's prima facie case thus turns on whether she was "qualified for the job and met [the employer's] legitimate expectations." *Hill*, 523 F. App'x at 215 (citing *Warch*, 435 F.3d at 520). Defendants maintain that Plaintiff did not meet their legitimate expectations because she allowed her license to lapse. ECF No. 34-2 at 15; ECF No. 42 at 2–3. In response, Plaintiff first argues that aside from the license expiration, she was performing her duties at a satisfactory level at the time of her termination. As Plaintiff notes, Lewis conceded that there was nothing unsatisfactory about Plaintiff's performance beside Lewis's concerns about timeliness, mistakes,

---

[11] To be clear, while the Court found an interrogatory response insufficient to create a genuine dispute over Lewis's involvement in the decision to terminate Plaintiff, the response here is adequate to satisfy this prong of Plaintiff's prima facie case because the response is unambiguous and the issue is not addressed by other evidence in the record.

and the incident in which she was allegedly rude to a patient. ECF No. 34-10 at 68. Johnson

similarly testified that Plaintiff was "in a satisfactory status." ECF No. 34-16 at 93. More

importantly, Plaintiff also highlights that her position description only required that she hold a

valid nursing license "at the time of appointment." ECF No. 34-6 at 5. Additionally, though the

Department had a license monitoring policy in place at that time, it placed the burden on its

management staff to notify employees when their licenses were set to expire, not on the

employees themselves. ECF No. 34-16 at 124. And Johnson conceded that there was no evidence

in Plaintiff's file that Plaintiff had ever received a copy of that policy. *Id*. at 105–06. Defendants'

arguments that Plaintiff failed to meet their legitimate expectations are therefore not sufficiently

persuasive to defeat Plaintiff's prima facie case.

The burden thus shifts to Defendants to articulate a legitimate, non-discriminatory reason

for Plaintiff's termination. They have done so by identifying Creekmur's zero tolerance policy

for license lapses, which Defendants reasonably justify by noting the potential liability that they

could face for allowing unlicensed practice. ECF No. 34-2 at 19–20; ECF No. 42 at 7. As alluded

to previously, however, a reasonable jury could find that this explanation was pretextual. In

general, a plaintiff can demonstrate pretext "either by showing that [the employer's] explanation

is 'unworthy of credence' or by offering other forms of circumstantial evidence sufficiently

probative of age discrimination." *Mereish*, 359 F.3d at 336 (quoting *Tex. Dep't of Cmty. Affairs

v. Burdine*, 450 U.S. 248, 256 (1981)). Plaintiff persuasively employs both strategies here. ECF

No. 40 at 27–28.

First, as Plaintiff notes, the zero tolerance policy is not documented in any written

materials in the record and is established only in Johnson's affidavit. ECF No. 34-17 at 4.

Notably, Creekmur did not claim to have such a policy in the process of Thelesa Bryant's

termination. According to the Prince George's County Personnel Board opinion, Johnson and Creekmur cited a number of factors for the decision to terminate Bryant, including that she worked without a license for three months, knew of the lapse but failed to alert the Department, lacked documentation that the lapse was not her fault, and could no longer be trusted as a leader. ECF No. 40-3 at 9. No mention was made of a zero tolerance policy, even though the Board considered Bryant's appeal in 2016, well after both Bryant and Plaintiff were terminated in 2015. While Creekmur could perhaps have chosen to not identify such a policy in litigating Bryant's appeal, it is unclear what reasonable basis she would have for doing so, and there is no evidence in the record supporting such an inference. Instead, drawing all inferences in Plaintiff's favor, a reasonable trier of fact could find that the purported zero tolerance policy has been invented as an after-the-fact pretextual justification for terminating Plaintiff.

Plaintiff also employs comparator evidence as a means of demonstrating pretext. It is "'especially relevant' to a showing of pretext . . . that other employees who were similarly situated to the plaintiff (but for the protected characteristic) were treated more favorably." *Laing v. Fed. Express Corp.*, 703 F.3d 713, 719 (4th Cir. 2013) (quoting *McDonnell Douglas*, 411 U.S. at 804)). Generally, "plaintiffs are required to show that they are similar in all relevant respects to their comparator." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010). Plaintiff cannot make such a showing as to Lisa Berry because her lapse and punishment took place before Creekmur became Health Officer. ECF No. 34-16 at 97; ECF No. 34-17 at 1–2; ECF No. 34-18 at 58; *see Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019). Nor is Bryant a useful comparator in this context given that she was in a more senior role than Plaintiff and was subject to the same adverse action.

Plaintiff accordingly focuses on Beasley, who was in the same Community Health Nurse II role as Plaintiff and had an unintentional license lapse in 2013. ECF No. 34-23 at 1–2. Beasley, however, was 56 years old at the time of her lapse, compared to Plaintiff's age of 68, and there is no evidence that she was the target of age-based comments by her supervisor as Plaintiff was. ECF No. 34-21 at 2; ECF No. 34-24 at 2. Most noteworthy about Beasley's case is that while her final punishment was reduced to a three-day suspension because the Department determined that she was not at fault for the lapse, her initial proposed punishment was only a ten-day suspension, not termination. ECF No. 34-21 at 1. Defendants have given no explanation for why a mere suspension was recommended for Beasley rather than termination; that Defendants eventually determined that Beasley was not at fault does not explain the issue because there is no evidence that they were aware of the circumstances of her lapse when the ten-day suspension was proposed. ECF No. 34-22 at 2; ECF No. 34-23 at 2. Nor is there any indication in the record why the "huge liability" of employing an unlicensed nurse – which Johnson would later raise at Plaintiff's grievance hearing as a reason for her termination – was not such a grave concern in Beasley's case. ECF No. 34-12 at 38. It also remains unclear why that risk would be mitigated by the fact that the lapse was not Beasley's fault. While there are conceivable reasons for Defendants to have proposed and imposed a lesser punishment for Beasley than for Plaintiff, including that Beasley was the union president, Defendants' failure to provide a logical explanation here contributes to a genuine dispute about why Plaintiff was treated differently.

To be sure, in spite of these indicators of pretext, inferences can certainly be drawn that Plaintiff was terminated for reasons that were not the ones Defendants have proffered but that were not based in unlawful age discrimination. For example, a reasonable trier of fact could find that Johnson and Creekmur felt compelled to terminate Plaintiff because they did not want their

recent firing of Bryant for a license lapse to look overly severe or as though it was based in personal animus toward Bryant. But a factfinder could also reasonably infer that Johnson shared Lewis's age-based concerns about Plaintiff and supported termination for that reason. The genuine issues of material fact about why Lewis investigated Plaintiff's license status, when and how Johnson learned of Lewis's concerns, whether Creekmur's purported zero tolerance policy existed, and why Beasley was treated more leniently than Plaintiff, are sufficiently disputed to be presented to a finder of fact. A jury that reasonably viewed each issue in Plaintiff's favor could reject Defendants' proffered explanation for the decision to terminate Plaintiff and conclude that age discrimination was the but-for cause. Accordingly, the Court will deny Defendants' Motion for Summary Judgment.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment, ECF No. 34, is denied. A separate Order shall issue.


Date: <u>March 4 , 2020</u>                               <u>      /s/                                        </u>
                                                          GEORGE J. HAZEL
                                                          United States District Judge